IN THE UNITED STATES DISTRICT COURT FOR THE
NORTHERN DISTRICT OF OKLAHOMA

GERALDINE DUBOIS, Guardian of the   )
Person and Estate of Gregory Steven DuBois,   )
    )
   Plaintiff,   )
    )  Case No. 12-CV-677-JED-PJC
v.   )
    )
THE BOARD OF COUNTY COMMISSIONERS   )
OF MAYES COUNTY, OKLAHOMA;   )
FRANK CANTEY; CHUCK WARD; JEFFERY   )
BARTLETT; S. BROWN; MITCH GOODMAN;   )
EMILY GARCIA; MIKE REED;   )
    )
   Defendants.   )

## OPINION AND ORDER

Before the Court are the defendants' motions for summary judgment (Doc. 121, 130, 131, 132, 133, 134, 138).

### I. Background

Gregory Dubois was detained in the Mayes County Jail (Jail) between April 8 and July 16, 2011. His guardian, who is the plaintiff here, alleges that throughout Mr. Dubois' three months in the Jail he exhibited signs of physical distress that Jail officials ignored. While he was in the Jail, Mr. Dubois was frequently sick, and he spent his last several weeks at the Jail in an isolation cell. Although the Jail's policies provided that a medical doctor / licensed physician would provide medical care, Jan Wells, a nurse practitioner, was the only medical professional available. Wells had an oral contract with Frank Cantey, who was the Mayes County Sheriff. Pursuant to the contract, Wells was paid $1,000 per month in exchange for visiting the Jail once per week.

Wells examined Mr. Dubois twice over the course of his time at the Jail, once on April 10, 2011 and the other on May 7, 2011, despite the fact that Dubois frequently complained of stomach pain and he vomited numerous times between May and July, 2011.  Dubois has testified that he threw up almost daily at the Jail during that time, but Jail staff did not summon medical attention for him.  He lost significant weight during his time at the Jail.[1]  When he finally received emergency medical attention on July 16, 2011, his colon had been perforated due to cancer and, as a result of loss of blood flow, his right leg had to be amputated.  It is undisputed that neither Mr. Dubois nor anyone else at the Jail was aware that he had cancer while he was incarcerated there.  The following chronology further summarizes the record evidence – construed in a light favorable to plaintiff – regarding Mr. Dubois' condition and the Jail's response thereto.

*May 2011*

On May 17, 2011, Jailer Steven Brown[2] was informed that Mr. Dubois' cell mates had locked him out of their shared cell because he was sick.  Dubois then reported directly to Brown that he was not feeling well and believed he was having a gall stone attack.  Dubois was moved to another cell because, in light of his frequent vomiting, the inmates in his cell refused to let him in the cell. Minutes later, Brown and another Jailer, Jeffery Bartlett, were summoned to Dubois' new cell.  When they arrived, other inmates in the cell reported that Dubois had thrown up blood, and the inmates requested a mop.  Bartlett and Brown entered the cell and observed a brown, liquid substance on the toilet and the floor, which Bartlett testified was a "very big mess" and

---

[1]     The evidence is conflicting, but the Jail's records reflect that he lost between 25 and 40 pounds during the three months he was there.

[2]     Steven Brown is named as a defendant in this action as S. Brown.

2

had upset Dubois' cell mates.  When asked what he did "for [Dubois'] throwing up blood" on that occasion, Bartlett testified that he did not remember if he did anything immediately.

Ultimately, due to the repeated lock outs and reports by other inmates in two different cells, Dubois was moved to a detox cell for observation, but he did not receive any medical attention.  Bartlett initially claimed that he notified "the doctor," even though there was not one on staff, but he subsequently testified that "the supervisor was notified." [3]  Nurse Wells testified that she was not informed that Dubois was throwing up, or throwing up blood, on May 17.

*June and July 2011*

On June 8, 2011, Dubois complained to Bartlett of stomach and back pain, and Bartlett provided Tylenol.  Bartlett testified that, by June 8, Dubois continued to make the same type of complaints "over and over again."  Bartlett also testified that there was more than one incident when Dubois "was getting sick and throwing up and it was a problem" but Bartlett did not "recall if it was the entire time."   On June 9, Bartlett administered Tums to Dubois. Dubois continued to complain of stomach pain, which he described as the most severe pain in his life, on June 10.  Another Jailer – Blake Crittenden – moved Dubois into booking to observe him and provided him Pepto Bismol "per Supervisor [Mitch] Goodman."

On June 11, Dubois was moved to an isolation cell "for medical reasons."  He remained in that cell for eight days, but received no medical care or evaluation during that time.  On June 19, he was placed in a seven man cell, which was short-lived.  Dubois was returned to an isolation cell the following day, June 20, with the Jail logs noting, "inmate continues to vomit." Mr. Dubois remained in the isolation cell from June 20 to July 15, without any medical care or evaluation by the nurse or any other medical provider.

---

[3]     Mitch Goodman was the Jail Supervisor.

On July 15 at 10:00 p.m., Jailer Jon Lee responded to a distress call from Mr. Dubois, who reported that he had been throwing up blood. Lee entered Dubois' cell and observed a "puddle of blood" on the floor. He took Dubois to a detox cell and contacted defendant Mitch Goodman, who was the Jail Supervisor. An hour and fifteen minutes later, approximately 11:15 p.m., Lee witnessed Mr. Dubois continuing to throw up in the detox cell.  Lee's entry into the Jail log noted that "inmate Dubois looked jaundice[d] and area around eyes [was] black."

Lee called the Mayes County Sheriff's Office to request that a deputy transport Dubois to the hospital, but Lee was informed that all deputies were out on calls.  At 11:30 p.m., Lee called Chuck Ward, the Jail Administrator, who told Lee to call Nurse Wells. At 11:40 p.m., Wells advised Lee to "get [Dubois] transported to the [emergency room]."  Lee again contacted Ward. Ward arrived approximately 35 minutes later and transported plaintiff to the emergency room of a local Mayes County hospital at approximately 12:15 a.m.  Ward testified that, when he arrived at the Jail, Dubois was pale and obviously sick and was limping and had a hard time walking. Although it took numerous phone calls and over two hours before Dubois was finally taken to a hospital for his obvious emergency medical condition, there is no evidence that anyone at the Jail or who was called that evening even considered calling 911 or an ambulance for Dubois.[4]

Upon Dubois' arrival at the local emergency room, hospital staff noted that his condition was very serious, and he was transported by Life Flight to Saint Francis Hospital in Tulsa, where he underwent surgery for a perforated colon.  Due to complications from loss of blood and hemorrhagic shock on July 15-16, 2011, his right leg had to be amputated on July 19, 2011. Dubois subsequently filed this litigation, claiming violations of his rights under the United States and Oklahoma Constitutions.

---

[4] Dubois asserts that he completed a slip requesting medical care days before he was taken to the hospital, but that he did not receive medical care at that time.

II.     **Summary Judgment Standards**

Summary judgment is appropriate "if the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to judgment as a matter of law." Fed. R. Civ. P. 56(a); *see Celotex Corp. v. Catrett*, 477 U.S. 317, 322-23 (1986); *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). "[S]ummary judgment will not lie if the dispute about a material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson*, 477 U.S. at 248. The courts thus must determine "whether the evidence presents a sufficient disagreement to require submission to a jury or whether it is so one-sided that one party must prevail as a matter of law." *Id.* at 251-52. The non-movant's evidence is taken as true, and all justifiable and reasonable inferences are to be drawn in the non-movant's favor. *Id.* at 255. The court may not weigh the evidence and may not credit the evidence of the party seeking summary judgment and ignore evidence offered by the non-movant. *Tolan v. Cotton*, ___ U.S. ___, 134 S. Ct. 1861, 1866 (2014) (per curiam).

III.    **Discussion**

A.      **Law Governing Deliberate Indifference to Serious Medical Needs**

The Eighth Amendment "imposes a duty on prison officials to provide humane conditions of confinement, including adequate food, clothing, shelter, sanitation, medical care, and reasonable safety from serious bodily harm." *Tafoya v. Salazar*, 516 F.3d 912, 916 (10th Cir. 2008).[5] Prisons must "make available to inmates a level of medical care which is reasonably designed to meet the routine and emergency health care needs of inmates." *Ramos v. Lamm*, 639

---

[5]     Mr. Dubois was a pretrial detainee at the time of his incarceration in the Jail. "Under the Fourteenth Amendment due process clause, 'pretrial detainees are . . . entitled to the degree of protection against denial of medical attention which applies to convicted inmates' under the Eighth Amendment." *Martinez v. Beggs*, 563 F.3d 1082, 1088 (10th Cir. 2009) (quoting *Garcia v. Salt Lake County*, 768 F.2d 303, 307 (10th Cir. 1985)).

F.2d 559, 574 (10th Cir. 1980) (quoting *Battle v. Anderson*, 376 F. Supp. 402, 424 (E.D. Okla. 1974)).  Claims based upon a failure of prison officials to provide medical care for serious medical needs of inmates are judged under the "deliberate indifference to serious medical needs" test of *Estelle v. Gamble*, 429 U.S. 97 (1976).  As explained by the Supreme Court in *Estelle*:

> The [Eighth] Amendment embodies "broad and idealistic concepts of dignity, civilized standards, humanity, and decency . . . against which we must evaluate penal measures. . . .
>
> These elementary principles establish the government's obligation to provide medical care for those whom it is punishing by incarceration. An inmate must rely on prison authorities to treat his medical needs; if the authorities fail to do so, those needs will not be met. In the worst cases, such a failure may actually produce physical "torture or a lingering death," . . . the evils of most immediate concern to the drafters of the Amendment. In less serious cases, denial of medical care may result in pain and suffering which no one suggests would serve any penological purpose. The infliction of such unnecessary suffering is inconsistent with contemporary standards of decency as manifested in modern legislation codifying the common-law view that "it is but just that the public be required to care for the prisoner, who cannot by reason of the deprivation of his liberty, care for himself."
>
> We therefore conclude that deliberate indifference to serious medical needs of prisoners constitutes the "unnecessary and wanton infliction of pain," . . . proscribed by the Eighth Amendment. This is true whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.  Regardless of how evidenced, deliberate indifference to a prisoner's serious illness or injury states a cause of action under § 1983.

429 U.S. at 102-05 (internal citations and footnotes omitted).

In accordance with the principles set forth in *Estelle*, "deliberate indifference" is defined as something more than mere negligence; it requires knowing and disregarding an excessive risk to inmate health or safety.  *Farmer v. Brennan*, 511 U.S. 825, 837 (1994).  Deliberate indifference has both objective and subjective components.  *Wilson v. Seiter*, 501 U.S. 294, 298-99 (1991).  The objective component is met if the harm suffered is sufficiently serious.  *Id.* at 298.  "A medical need is serious if it is 'one that has been diagnosed by a physician as mandating

treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"  *Ramos*, 639 F.3d at 575; *see also Al-Turki v. Robinson*, 762 F.3d 1188, 1192-93 (10th Cir. 2014).

The subjective component of the deliberate indifference test is met if a prison official knows of and disregards an excessive risk to inmate health or safety.  *Farmer*, 511 U.S. at 837. "To prevail on the subjective component, the prisoner must show that the defendant[] knew he faced a substantial risk of harm and disregarded that risk, by failing to take reasonable measures to abate it." *Martinez*, 563 F.3d at 1089 (quoting *Callahan v. Poppell*, 471 F.3d 1155, 1159 (10th Cir. 2006)).  "[A] jury is permitted to infer that a prison official had actual knowledge of the constitutionally infirm condition based solely on circumstantial evidence, such as the obviousness of the condition."  *Tafoya*, 516 F.3d at 916 (quoting *Farmer*, 511 U.S. at 842). "Deliberate indifference to serious medical needs is shown when prison officials have prevented an inmate from receiving recommended treatment or when an inmate is denied access to medical personnel capable of evaluating the need for treatment." *Ramos*, 639 F.2d at 575.

**B.    Defendants Sued in Their Individual Capacities**

Each of the moving individual defendants asserts a qualified immunity defense.  In resolving questions of § 1983 qualified immunity at the summary judgment stage, courts engage in a two-pronged inquiry.  *Tolan*, 134 S. Ct. at 1865.  The first prong "asks whether the facts, '[t]aken in the light most favorable to the party asserting the injury, . . . show the officer's conduct violated a [federal] right.'"  *Id.* (quoting *Saucier v. Katz*, 533 U.S. 194, 201 (2001)); *see also York v. City of Las Cruces*, 523 F.3d 1205, 1209 (10th Cir. 2008).  The second prong asks "whether the [federal] right in question was 'clearly established' at the time of the violation."  *Id.* at 1866 (quoting *Hope v. Pelzer*, 536 U.S. 730, 739 (2002)).  Government officials are "shielded

7

from liability . . . if their actions did not violate clearly established" federal rights "of which a reasonable person would have known." *Id.* (quoting *Hope*, 536 U.S. at 739) (internal quotation marks omitted). "'[T]he salient question . . . is whether the state of the law' at the time of [the] incident provided 'fair warning' to the defendants 'that their alleged [conduct] was unconstitutional.'" *Id.* (quoting *Hope*, 536 U.S. at 741).

The courts have discretion to determine "which of the two prongs of the qualified immunity analysis should be addressed first in light of the circumstances in the particular case at hand." *Pearson v. Callahan*, 555 U.S. 223, 236 (2009). Here, the Court will first assess whether the law was clearly established at the time that Mr. Dubois was incarcerated at the Jail in 2010.

### 1.    Clearly Established Law (Second Prong)

Years before Mr. Dubois was in the Jail in 2010, the law was clearly established that a prison official's deliberate indifference to an inmate's serious medical needs violates the Eighth Amendment. *Estelle*, 429 U.S. at 104; *Lopez v. LeMaster*, 172 F.3d 756, 764 (10th Cir. 1999). It was also clearly settled law that a delay in medical care constitutes an Eighth Amendment violation where the plaintiff can show the delay resulted in substantial harm. *Mata v. Saiz*, 427 F.3d 745, 751 (10th Cir. 2005). The "substantial harm requirement 'may be satisfied by lifelong handicap, permanent loss, or considerable pain.'" *Id.* (quoting *Garrett v. Stratman*, 254 F.3d 946, 950 (10th Cir. 2001)). Thus, "the 'substantial harm' caused by a delay in treatment may be a permanent physical injury, or it may be an 'intermediate injury, such as the pain experienced while waiting for treatment and analgesics.'" *Al-Turki*, 762 F.3d at 1193.

"Although 'not every twinge of pain suffered as a result of delay in medical care is actionable,' when the pain experienced during the delay is substantial, the prisoner 'sufficiently establishes the objective element of the deliberate indifference test.'" *Kikumura v. Osagie*, 461

F.3d 1269, 1292 (10th Cir. 2006) (quoting *Sealock v. Colorado*, 218 F.3d 1205, 1210 (10th Cir. 2000)).   Numerous types of ailments and pain have been considered sufficiently serious medical conditions within the *Estelle* framework.   *See Lopez*, 172 F.3d at 764 (contusions and severe strains); *Self v. Crum*, 439 F.3d 1227, 1232 (10th Cir. 2006) (chest pains); *Mata*, 427 F.3d at 752-54 (severe pain and worsening of heart condition); *Kikumura*, 461 F.3d at 1292-93 (severe pains, cramps, vomiting as a result of undiagnosed hyponatremia); *Al-Turki*, 762 F.3d at 1193-94 (five hours of severe pain caused by passage of kidney stones).   In *Al-Turki*, the Tenth Circuit concluded that "several hours of untreated severe pain . . . would fall on the actionable side of the line."   762 F.3d at 1194.   The court there found that the plaintiff's "complaints of severe abdominal pain" were "squarely within" law that was clearly established in this Circuit "*since at least 2006*" that a prison official's denial of medical care in the face of recognizable symptoms which potentially create a medical emergency gives rise to a deliberate indifference claim.   *Id.*[6]

Based on the foregoing, the law was clearly established before 2010 that a claim for deliberate indifference to serious medical needs lies where jailers delay or deny medical care in the face of symptoms – here, recurring stomach pain, vomiting, and throwing up copious quantities of blood over two months – that are indicative of a serious medical condition.   By 1981, the law was also clearly established that "[d]eliberate indifference to serious medical needs is shown when . . . [prison officials deny] an inmate . . . access to medical personnel capable of evaluating the need for treatment."   *See Ramos*, 639 F.2d at 575.   That Dubois spent over a

---

[6]      The defendants contend that *Al-Turki* has no application to this case because the defendant was a medical professional rather than a jail officer.   However, the fact that the defendant there was a nurse does not render it inapplicable here.   *See Estelle*, at 104 ("deliberate indifference to serious medical needs of prisoners [violates the Eighth Amendment] . . . . whether the indifference is manifested by prison doctors in their response to the prisoner's needs or by prison guards in intentionally denying or delaying access to medical care or intentionally interfering with the treatment once prescribed.").

month in the isolation cell where he was placed for medical reasons but was not provided medical care or access to medical personnel capable of evaluating his need for treatment falls squarely within that established law.  The record evidence construed in plaintiff's favor would also show that the significant delay in medical care resulted in substantial harm to Dubois – the perforated colon and the loss of his right leg – which presents a claim for deliberate indifference under law that was clearly established by at least 2005.  *See Mata*, 427 F.3d at 751.  The evidence also satisfies the objective component of deliberate indifference, because the pain and consequences suffered by Mr. Dubois from May to July, 2011 were clearly quite serious.

Having determined that the law was clearly established by 2010, the Court will next analyze the evidence in order to determine which of the defendants directly participated in denying or delaying medical care in a deliberately indifferent manner that violated Dubois' constitutional rights.

### 2.     Violation of Mr. Dubois' Constitutional Rights (First Prong)

#### a.     Chuck Ward

Chuck Ward was the Jail Administrator during the relevant time-frame.  He began work in that position shortly before June 20, 2011.  Ward also drove Mr. Dubois to the hospital on July 16, 2011.  Plaintiff claims that Ward was "personally involved in the care of Dubois," but has provided no evidence of that, other than the transport to the hospital.  Plaintiff also faults Ward for being responsible to review the Jail's daily medication log and asserts that he "would have known" that Mr. Dubois was either out of medication, refused medication, or did not receive medication on several days while at the Jail.  (Doc. 172 at 8).  However, plaintiff has not identified any direct causal link between a failure to provide Mr. Dubois his daily psychiatric

medications and the ultimate harm that he suffered from the alleged delay in medical treatment for his stomach pain and vomiting.

Plaintiff has also provided no evidence that Ward was made aware of Dubois' condition at any time prior to 11:30 p.m. on July 15, 2011, when Ward was informed by phone that Dubois was throwing up blood.  Ward instructed Lee to call Nurse Wells, who advised Lee that Dubois needed to go to the emergency room.  At 11:40 p.m., Ward was advised of Wells' instruction, and Ward thereafter traveled to the Jail to transported Mr. Dubois to the hospital, arriving at approximately 12:15 a.m. on July 16.  There is no evidence that, prior to that transport, Ward had any contact with Dubois or was involved in his care, or lack thereof, at the Jail.

Plaintiff appears to attempt to hold Ward liable solely because he was the Jail Administrator at the time.  A supervisor also may not be held liable individually under a theory of respondeat superior.  *Estate of Booker v. Gomez*, 745 F.3d 405, 435 (10th Cir. 2014) (citing *Schneider v. City of Grand Junction Police Dept.*, 717 F.3d 760, 767 (10th Cir. 2013)).  "[M]ere negligence is insufficient to establish supervisory liability." *Johnson v. Martin*, 195 F.3d 1208, 1219 (10th Cir. 1999).   Three elements are required to establish supervisory liability: (1) personal involvement; (2) causation; and (3) state of mind.  *Schneider*, 717 F.3d at 767.  Section 1983 "allows a plaintiff to impose liability upon a defendant-supervisor who creates, promulgates, implements, or in some other way possesses responsibility for the continued operation of a policy the enforcement (by the defendant-supervisor or her subordinates) of which 'subjects, or causes to be subjected' that plaintiff 'to the deprivation of any rights . . . secured by the Constitution." *Dodds v. Richardson*, 614 F.3d 1185, 1199 (10th Cir. 2010) (quoting 42 U.S.C. § 1983).

Plaintiff has not presented any evidence of a policy for which Ward was responsible, or which caused Mr. Dubois damage.  The Jail policies in place at the time were established over three years before Ward became the Jail Administrator.  Plaintiff asserts generally that Ward failed to review the Jail "file" which would have informed him about the medication issues and failed to "ensure[] that [Jail] policies were followed" and "fail[ed] to rectify" alleged prior failures at the Jail to provide medical services.  But the record does not support those claims, and plaintiff's claims against Ward sound, at most, in negligence, rather than deliberate indifference.

The duties of the Jail Administrator included responsibility for the day-to-day operations of the Jail, the overall well-being of inmates, and training.  However, it does not appear that Ward – who had only recently become the Jail Administrator – understood that he had those duties.  Both former Sheriff Cantey and Mitch Goodman, the latter of whom was the Sheriff's Rule 30(b)(6) deposition designee, testified that Ward himself received *no training* as to his Jail Administrator duties.  Moreover, Goodman testified that, with respect to medical issues, a Jailer was to first notify the Supervisor – who at the time was Goodman – and the Supervisor would notify the Jail Administrator only if the problem was deemed an emergency situation or required transport to a hospital.  The record contains no evidence that either Goodman or any other Jail staff advised Ward of Dubois' condition at any time prior to July 15.

The record does not reflect deliberate indifference by Ward to Dubois' serious medical needs.  Hence, Ward's summary judgment motion (Doc. 132) is **granted**.

### b.    Mitch Goodman

Plaintiff alleges that Goodman was in charge of re-ordering medications and he failed to do so, such that Mr. Dubois at times went without medication.  As noted with respect to similar medication-related claims against Ward, plaintiff has not provided any evidence of a causal

nexus between medication issues and Dubois' perforated colon or loss of limb.  While at the Jail, Mr. Dubois had not been diagnosed with colon cancer, and none of the medications were for any condition related to it; instead, the medications were for mental health conditions, high blood pressure, and anxiety. There is an insufficient causal link between the alleged failure to provide proper medications and the ultimate constitutional harm that is alleged in this case, and the medication issues are thus insufficient to establish deliberate indifference by Goodman.[7]

However, plaintiff has provided evidence that, on June 10, 2011 when Mr. Dubois was lying on his bunk suffering severe stomach pain, Goodman authorized Pepto Bismol to be given to Dubois rather than providing for medical care or notifying the Jail nurse.  Wells, the Jail nurse, testified that she was not notified of Dubois' complaints of severe stomach pain and that, had Goodman consulted with her, she would have told him not to provide the Pepto Bismol.  While there is no evidence that the Pepto Bismol itself had any direct causal link to Dubois' injuries, the failure of the Jail Supervisor, Goodman, to timely seek medical care for Dubois at a time when he was reporting severe pain, could be found to have been deliberately indifferent.

While Goodman attempted at deposition to distance himself from knowledge of Dubois' condition, the record contains other evidence that Goodman was aware of Dubois' condition but failed to ensure that Dubois received timely medical treatment or access to medical personnel who could evaluate his need for treatment.  For example, Bartlett testified that, as to the May 17, 2011 reports that Dubois was throwing up blood, the Jail Supervisor was notified.  Robert Jackson, who worked at the Jail in the relevant timeframe, recalled that Dubois was put in

---

[7]   While the medication issues lack a sufficient causal nexus to the constitutional harm for purposes of establishing a claim of deliberate indifference to a serious medical need, the Court reserves ruling as to whether an alleged failure to properly provide psychiatric medications to Mr. Dubois has any remaining relevance to the issues in this case.

isolation because he was sick, and he testified that he heard that from Goodman.  Jackson also testified that he was trained that it was the responsibility of the Jail Supervisor to call for a doctor or nurse if an inmate needed medical care.  Construing the evidence in plaintiff's favor as the Court must at this stage of the proceedings, it is reasonable to infer that Goodman was aware of Dubois' condition on May 17 as well as in June and July of 2011.

The record also includes evidence from which a reasonable jury could infer that Goodman directly contributed to the delay of over two hours in Mr. Dubois receiving necessary emergency treatment on July 15-16, 2011 and that such delay was a cause of Dubois' loss of a limb.  While Goodman asserts that he does not recall being contacted about Dubois' grave condition on the evening of July 15, Jail reports support plaintiff's claim that staff at the Jail called Goodman at 10:00 p.m. to inform him that Mr. Dubois had been throwing up blood.  The report prepared by Jon Lee does not reflect what Goodman's instructions were, but a reasonable jury could infer from Jail documents that Goodman did not direct that Dubois be taken to a hospital or otherwise receive medical treatment despite vomiting blood:

> At approximately 22:00 hours, Gregory Dubois was needing a jailer back to his cell (B3).  Tower advised me of this, I then went to cell B3 to check on Dubois.  Dubois informed me that he has been throwing up blood.  I looked in his cell, there was a puddle of blood in side of the cell.  I then took Dubois to detox cell 1.  *I contacted Mitch Goodman at approximately 22:00 and informed him of the incident.*  At approximately 23:15 I noticed that Dubois was throwing up in the detox cell.  I then called the Mayes County Sheriffs Office to see about getting a deputy to transport Dubois to ER.  At approximately 23:30 the Sheriffs Office notified me that all deputys were on call.  At approximately 23:30 I contacted Chuck Ward and told him of the problem.  He then advised me to call Jan Wells.  At approximately 23:35 I contacted Jan Wells and informed her of the problem.  She then advised me to get him transported to the ER.  At approximately 23:40 I called Chuck Ward back and informed him of what Jan Wells said.   At approximately 00:15 Chuck Ward showed up at the Mayes County Jail and transported Dubois to the ER.

(Doc. 168-4) (errors uncorrected; italics added).  At his deposition, Goodman could not recall what he informed Lee and would not testify that he did, or did not, instruct Lee to contact an ambulance or otherwise seek emergency transport for Dubois to a hospital.

In *Lopez*, the Tenth Circuit concluded that summary judgment was improper because there were factual issues concerning whether a sheriff was aware of the plaintiff's injuries and instructed a jailer not to take plaintiff to the hospital.  172 F.3d at 764.  The only evidence on that issue was the plaintiff's testimony that the jailer "called an unknown person, who told the jailer not to take [the plaintiff] to the hospital because he was still conscious."  *Id.*  That was sufficient in *Lopez* to infer that the sheriff was aware of the plaintiff's condition and failed to instruct jailers to obtain medical care for the inmate.  *See id.*  The evidence is much stronger in this case, as it reveals facts from which Goodman's personal knowledge of Mr. Dubois' condition between May and July, and his personal involvement in denying or delaying medical care necessary to diagnose and treat that condition, may be directly inferred.  There is also evidence from which deliberate indifference could be inferred from the obvious seriousness of Mr. Dubois' condition in the two months prior to receiving medical care and the fact that Goodman was contacted but did not ensure that Dubois received timely medical care or evaluation.  Accordingly, Goodman's motion for summary judgment (Doc. 133) will be **denied**.

### c.  Steven Brown and Jeffery Bartlett

On May 17, 2011, other inmates in two different cells notified Brown and Bartlett that Dubois was sick and vomiting, and inmates in one of the cells notified them that Dubois was throwing up blood.  Dubois himself reported to Brown that he felt he was suffering a gallstone attack, reflecting that he was in serious pain.  Bartlett and Brown entered the second cell and observed a brown, liquid substance on the toilet and the floor, which Bartlett testified was a

"very big mess" and which had upset Dubois' cell mates.  When asked what he did "for [Dubois'] throwing up blood" on that occasion, Bartlett testified that he did not remember if he did anything immediately.  Brown testified that, despite being informed of Dubois feeling like he was suffering a gallbladder attack and the reports from other inmates that he was throwing up blood, he did not call the nurse or attempt to provide any medical care to Mr. Dubois.  He further testified that he did inmate counts and would have observed Mr. Dubois on numerous other occasions and that Mr. Dubois "appeared black around the eyes all the time."

On June 8, 2011, Dubois complained to Bartlett of stomach and back pain.  Bartlett gave him Tylenol.  Bartlett testified that, by that date, Dubois continued to have the same type of complaints "over and over again."  Bartlett also testified that there was more than one incident when Dubois "was getting sick and throwing up and it was a problem" but he did not "recall if it was the entire time."  On June 9, Bartlett administered Tums to Mr. Dubois.  On June 11, Dubois was moved to an isolation cell "for medical reasons."  Bartlett was working during the time that Dubois was moved to the isolation cell for medical reasons, but Dubois did not receive any medical attention or evaluation during that time.  Brown was on duty when Dubois was returned to the isolation cell on June 20 for "continu[ing] to vomit" and would have conducted hourly checks on plaintiff during that time period.  Bartlett was also aware of the June 20 vomiting.

Bartlett testified that he considered the continuing vomiting to be a risk of serious harm to Mr. Dubois.  However, Dubois was not examined by any medical professional during the times when he notified Jail staff of severe stomach pain and vomiting, including the incidents in May and June when Brown and/or Bartlett were aware of Mr. Dubois' complaints of pain and the reports of other inmates that he was vomiting blood.  Although Bartlett testified that he believed he did tell Wells at some point that Dubois "had problems with his stomach and was

throwing up," he indicated that he did not talk to Wells about the May 17 or June 8 incidents specifically, and he was unclear on the timing of any purported conversation he had with Wells.

Construing the facts favorably to the plaintiff, there is a genuine issue of material fact regarding whether Mr. Dubois' condition on May 17 and throughout June was indicative of a serious medical need, as to which Bartlett and Brown were deliberately indifferent in failing to obtain medical care for Dubois. The facts are in dispute regarding the frequency and severity of plaintiff's vomiting and stomach pain throughout his stay, but there is evidence from which a jury could reasonably find that the circumstances reported to Brown and Bartlett – including that Dubois was throwing up blood in May and continued to vomit into at least late June – showed an obvious medical need requiring medical attention, but they did not obtain any medical attention for him. *See Ramos*, 639 F.2d at 575 ("A medical need is serious if it is 'one that has been diagnosed by a physician as mandating treatment or is one that is so obvious that even a lay person would easily recognize the necessity for a doctor's attention.'"). Cantey testified that, if inmates reported to jailers that Dubois was throwing up blood, on May 19 the jailers should have provided him with medical attention. (Doc. 167-4 at 14 [Dep. p. 53]). Cantey also testified that Dubois should have at least been seen by the solitary Jail nurse – Nurse Wells – when he was held in the isolation cell between June 11 and 19 for "medical reasons" and had to be returned there when he continued to vomit on June 20. (*Id.* [Dep. pp. 61-62]).[8]

---

[8]  Defendants argue that there is written evidence in Jail records of only a few specific instances of Dubois throwing up. In fact, the evidence shows more than two instances of Dubois throwing up. The Jail's own records, and the testimony of Goodman and Bartlett, reflect that Dubois threw up in May and he was in isolation – where he was put due to being sick and vomiting – for over a month. When the Jail tried to move Dubois out of isolation into a multi-inmate cell on June 19, he had to be returned to isolation the next day because he continued to vomit. Moreover, at least one Jailer – Christopher Buck – testified that there would not always be an incident report of an inmate throwing up.

The defendants argue that, because there is no evidence that Brown or Bartlett was involved in plaintiff's medical care after June, and because Bartlett left the employ of the Jail in June, Brown and Bartlett cannot be liable for the ultimate perforation of Dubois' colon and the resulting loss of blood and amputation of his right leg in July.  Those arguments present issues of causation, which are ordinarily fact questions for a jury.  *See Schneider v. City of Grand Junction Police Dep't*, 717 F.3d 760, 778 (10th Cir. 2013) ("Causation is generally a question of fact for the jury. . . . But whether the plaintiff has presented sufficient evidence of causation to defeat a motion for summary judgment is a legal question.").  Here, there is conflicting evidence regarding causation.  Plaintiff's expert, Dr. Hastings, has proffered an opinion that Mr. Dubois' "loss of his right leg could have been adverted by timely referral for appropriate, reasonable and necessary diagnostic evaluations and treatment by medical providers and physicians during his detention" at the Jail.  (Doc. 168-11 at 5).  Dr. Hastings further opined:

> In my medical opinion . . . had Gregory Steven Dubois been provided with appropriate, reasonable and necessary evaluations and diagnostic testing with appropriate diagnostic conclusions established and treatment provided between May 17, 2011 and July 15, 2011, he would not have experienced the near fatal gastrointestinal hemorrhage and shock, that caused him to lose his right leg.

(*Id.*).

While the defendants' expert disagrees as to causation, the conflicting testimony presents an issue of fact for the jury.  A reasonable juror could infer from the evidence that the failures of Brown and Bartlett to obtain medical attention for Dubois in May and June – when he was reporting pain consistent with a gallstone attack, was so sick that inmates in two different cells repeatedly locked him out or complained about his sickness, other inmates reported that he was throwing up blood, and he repeatedly complained of stomach pain and continued to vomit – were

direct causes of Dubois' ultimate emergency condition and loss of limb.  The motions of Brown (Doc. 134) and Bartlett (Doc. 138) are **denied**.

### d.       Frank Cantey

Plaintiff has not provided any evidence that the former Sheriff, Frank Cantey, had any knowledge of plaintiff's serious medical needs or deliberately disregarded them, or that Cantey was aware that inmates like plaintiff were at substantial risk of harm because of a constitutionally infirm condition that was obvious.  While there were certain obvious training deficiencies regarding the provision of medical care to inmates, that evidence does not support a claim against Mr. Cantey in his individual capacity.  In short, plaintiff has not presented evidence from which a jury could infer that Cantey had the requisite state of mind, was in any way personally involved in denying or delaying medical care to Dubois, or that he knew of and disregarded an excessive risk to Dubois' health or safety.  Cantey's summary judgment motion (Doc. 131) is **granted**.

### C.       Claims against Sheriff Reed and the Board

#### 1.       *Monell* Claims

Plaintiff has asserted claims against the Board of County Commissioners of Mayes County (Board) and the current Sheriff, Mike Reed, in his official capacity.  A claim against a government actor in his official capacity "is essentially another way of pleading an action against the county or municipality" he represents, and is considered under the standards applicable to 42 U.S.C. § 1983 claims against municipalities or counties. *Porro v. Barnes*, 624 F.3d 1322, 1328 (10th Cir. 2010); *see Kentucky v. Graham*, 473 U.S. 159, 166 (1985) ("[A]n official-capacity suit is, in all respects other than name, to be treated as a suit against the entity."); *Lopez*, 172 F.3d at

762 ("[Plaintiff]'s suit against Sheriff LeMaster in his official capacity as sheriff is the equivalent of a suit against Jackson County, [Oklahoma].").

To hold a county liable under § 1983, a plaintiff must demonstrate (1) the existence of a municipal policy or custom by which the plaintiff was denied a constitutional right and (2) that the policy or custom was the moving force behind the constitutional deprivation (i.e. "whether there is a direct causal link between [the] policy or custom and the alleged constitutional deprivation"). *See City of Canton v. Harris*, 489 U.S. 378, 385 (1989); *Monell v. Dep't of Soc. Servs. of City of New York*, 436 U.S. 658, 694 (1978); *Bryson v. City of Okla. City*, 627 F.3d 784, 788 (10th Cir. 2010) (citations omitted).

The Tenth Circuit has described several types of actions which may constitute a municipal policy or custom:

> A municipal policy or custom may take the form of (1) "a formal regulation or policy statement"; (2) an informal custom "amoun[ting] to 'a widespread practice that, although not authorized by written law or express municipal policy, is so permanent and well settled as to constitute a custom or usage with the force of law'"; (3) "the decisions of employees with final policymaking authority"; (4) "the ratification by such final policymakers of the decisions – and the basis for them – of subordinates to whom authority was delegated subject to these policymakers' review and approval"; or (5) the "failure to adequately train or supervise employees, so long as that failure results from 'deliberate indifference' to the injuries that may be caused."

*Bryson*, 627 F.3d at 788 (citations omitted).

With respect to a failure to train or supervise, a municipality may be liable where "the need for more or different training is so obvious, and the inadequacy [in training] so likely to result in the violation of constitutional rights, that the policymakers of the [municipality] can reasonably be said to have been deliberately indifferent to the need." *Canton*, 489 U.S. at 390. In *Canton*, the plaintiff was arrested and officers brought her to the police station in a patrol wagon. *Id.* at 381. Upon arrival, she made incoherent remarks and slumped to the floor. She

was released an hour later, and her family had her taken by ambulance to a nearby hospital, where she was diagnosed with severe emotional ailments.  *Id.*  Plaintiff brought a § 1983 claim, alleging that the officers – who failed to summon medical care for her during the hour she was at the police station – had been inadequately trained to make a determination as to when to summon medical care.  *Id.* at 381-82.  The Supreme Court held that, even where a municipality has a policy to provide medical care that is facially constitutional, a claim may be based upon a failure to train where the failure reflects deliberate indifference by the municipality.  *Id.* at 387-92.

Plaintiff has presented sufficient evidence to demonstrate the existence of a fact issue preventing summary judgment on the *Monell* claims.  Plaintiff alleges that Mayes County had a custom of failing to provide medical care in response to serious medical needs of jail inmates and failing to provide officers with proper training and supervision regarding inmate medical care, and there is evidence supporting those allegations.  Plaintiff has identified a prior complaint of a delay or denial of medical care for another inmate, which occurred before Dubois was at the Jail. The injuries to the other inmate occurred on February 8, 2011 when the inmate fell on a wet floor at the Jail, injuring his back, tailbone, head, and neck.  Jail staff "refused to take him to see a doctor for a medical treatment," and Jail staff provided that inmate Ibuprofen instead of contacting medical personnel.  An Oklahoma Department of Health investigator subsequently investigated the complaint regarding that alleged failure to provide medical care, visited the Jail, and prepared an investigation report finding that the complaint of inadequate medical care was substantiated.  (*See* Doc. 168-7).

While the Jail had policies providing for medical care for inmates, there is evidence that those policies were disregarded, and the deposition testimony of Jail staff reflected a general lack of knowledge of what the policies required.  (*See, e.g.,* Doc. 167-13 at 5 [Dep. p. 18]; Doc. 167-

10 at 11-12 [Dep. pp. 42-43, 47-48]).  Cantey and Goodman testified that, while policy provided that it was the Jail Administrator's duty to train Jailers and provide for the overall well-being of inmates, Ward did not receive *any* training regarding his responsibilities as Jail Administrator. Several witnesses, including Goodman, Ward, Cantey, and Brown, testified that the decision whether to call for medical attention for an inmate was entrusted solely to individual Jailers.

While Jailers, alone, were apparently entrusted to determine when medical care would be provided, Bartlett, Goodman, Brown, and Cantey testified that Jailers received no training on how to determine when an inmate was sick or had a medical condition requiring care from a physician or nurse.  Goodman said Jailers were trained to use "common sense" and would rely on their own experiences with their family members, which would not necessarily require contacting medical personnel when an inmate was lying on the floor complaining of stomach pain.  Cantey testified that he was not aware of any training that Jailers received regarding medical attention for inmates.  Brown testified that he was trained that, if an inmate had a "major medical issue," the Jailer should contact Wells and get her advice, but Brown indicated that he received no training to determine what a "major medical emergency" was, and a Jailer was to simply use their own judgment.

The foregoing evidence also supports plaintiff's claim of a deliberately indifferent failure to supervise Jailers in their medical judgments as to inmates, with serious consequences.  Left to their own judgment and without any apparent oversight, Jailers placed Dubois in an isolation cell for "medical reasons" for over a month, without access to any medical care or health care professional to assess Dubois' need for medical testing or treatment.  While the Jail had policies stating that inmates should receive medical care when needed, plaintiff has provided sufficient evidence supporting an inference that those policies were not enforced and there was no

supervision to ensure that Jailers obtained medical care when needed.  A jury could reasonably find that the need for more or different training and supervision was so obvious and the inadequacy so likely to result in the violation of inmates' constitutional rights that the county was deliberately indifferent.  *See Canton*, 489 U.S. at 390.

There are genuine issues of material fact that preclude summary judgment on the plaintiff's *Monell* claims.  The summary judgment motions of Reed, in his official capacity (Doc. 130) and the Board (Doc. 121), on plaintiff's claims under 42 U.S.C. § 1983, are **denied**.

### 2.      *Bosh* Claims

Plaintiff has asserted a claim that Mayes County violated Dubois' rights under Article 2, § 9 of the Oklahoma Constitution, which is the state equivalent of the Eighth Amendment to the United States Constitution. (*See* Third Amended Complaint at 10).  Plaintiff argues that such a claim is permitted under *Bosh v. Cherokee Cnty. Building Auth.*, 305 P.3d 994 (Okla. 2013).  In that case, the Oklahoma Supreme Court recognized a private cause of action for excessive force under Article 2, § 30 of the Oklahoma Constitution where jailers allegedly assaulted an inmate during booking, and the inmate was left in his cell without medical attention for two days. *Id.* at 996, 1001.  When the inmate filed suit, the government claimed it had immunity pursuant to the Oklahoma Governmental Tort Claims Act (OGTCA).  The Oklahoma Supreme Court responded by recognizing a constitutional claim, ruling that OGTCA immunity "does not mean that injured tort victims are at the mercy of their captors to be beaten, assaulted, and left without medical attention, without a remedy to deter such conduct." *Id.* at 1000.  The court further ruled that the OGTCA does not provide blanket immunity, so as to "render the Constitutional protections afforded the citizens of this State as ineffective, and a nullity." *Id.* at 1001.

Defendants claim that *Bosh* is limited to claims for excessive force under Article 2, § 30, while the plaintiff contends that *Bosh* can be extended to the allegations in this case. The Court need not determine this issue at this time because, even assuming that *Bosh* could be extended to the plaintiff's allegations here, the undisputed facts of this case reflect that any such claim is barred by the statute of limitations. The applicable statute provides that "[a]ll actions filed . . . by a person based upon facts that occurred while the person was an inmate in the custody of . . . the State of Oklahoma . . . or a political subdivision of the State of Oklahoma . . . shall be commenced within one (1) year after the cause of action shall have accrued." *Okla. Stat.* tit. 12, § 95(A)(11). Mr. Dubois' claims would have accrued between May 17, 2011 and July 16, 2011, but he did not initiate this lawsuit until more than a year later, on August 23, 2012.

Other federal courts in Oklahoma have concluded that the one year statute of limitations in § 95(A)(11), rather than the two year limitations period under the more general § 95(A)(3), applies to claims under the Oklahoma Constitution that are based on facts that occurred while the plaintiff was an inmate in state custody. *See, e.g., Koch v. Juber*, No. CIV-13-0750-HE, 2014 WL 2171753, at *2 (W.D. Okla. May 23, 2014); *Fisher v. Glanz*, No. 14-CV-678-TCK, 2016 WL 141846, at *8 (N.D. Okla. Jan. 12, 2016) ("[T]he Court holds that § 95(A)(11) trumps the more general § 95(A)(3) when a state constitutional claim is brought by an inmate or based upon facts that occurred while the person was an inmate in state custody."). This Court agrees and concludes that any state constitutional claims are time-barred in this case.

Plaintiff argues that § 95(A)(11) should not apply to the allegations concerning Dubois' time in the Jail, because he was at that time a pretrial detainee and should be afforded greater rights than apply to convicted persons. However, the statute does not distinguish between

inmates who have been convicted and those who have not, and courts have applied § 95(A)(11) to pretrial detainees.  *See Fisher*, 2016 WL 141846, at *8 (citing other Oklahoma authorities).

The defendants' motions for summary judgment are **granted** as to the state constitutional claims asserted by plaintiff.

## IV.    Conclusion

The summary judgment motions of Ward (Doc. 132) and Cantey (Doc. 131) are **granted**. The motions of the Board (Doc. 121) and Reed (Doc. 130) are **granted** as to plaintiff's state constitutional claims and **denied** as to plaintiff's claims under 42 U.S.C. § 1983.  The motions of Goodman (Doc. 133), Brown (Doc. 134), and Bartlett (Doc. 138) are **denied**.

SO ORDERED this 21st day of March, 2016.

JOHN E. DOWDELL
UNITED STATES DISTRICT JUDGE